1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                            NORTHERN DISTRICT OF CALIFORNIA

10                                    San Francisco Division

11    CAMILLE WEISHAAR,                         Case No. 14-cv-01352-LB

12              Plaintiff,

13          v.                                  **ORDER GRANTING IN PART AND
                                                DENYING IN PART SUMMARY
14    COUNTY OF NAPA, et al.,                   JUDGMENT**

15              Defendants.                     Re: ECF Nos. 93, 97

16                                    **INTRODUCTION**

17         Plaintiff Camille Weishaar sues on her own behalf and as personal representative of Ezekiel

18    Foster, her husband, who committed suicide while being held in a Napa County jail on a charge of

19    a probation violation.[1] Her claims arise mostly under 42 U.S.C. § 1983 and the Due Process

20    Clause of the Fourteenth Amendment to the U.S. Constitution. She also brings a wrongful-death

21    claim under California state law. The defendants — three people who worked at the jail and the

22    County of Napa — move for summary judgment. The parties have consented to magistrate

23    jurisdiction.[2] The court held a hearing on this matter on December 15, 2016. The court grants

24    summary judgment in favor of correctional officer Troy Duncan, grants the County summary

25

26

27    [1] *See generally* 2nd Am. Compl. – ECF No. 81. Record citations refer to the material in the Electronic
      Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28    [2] ECF Nos. 7, 13; ECF No. 16 at 6.

United States District Court
Northern District of California

judgment on the *Monell* claim, grants summary judgment on the prayer for punitive damages for the state wrongful-death claim, and otherwise denies the defendants' motions.

### STATEMENT

The plaintiff's decedent, Ezekiel Foster, hanged himself on November 1, 2012, while incarcerated at the Napa County Detention Center. Napa County Sheriff's deputies arrested him the previous day — less than 24 hours before his death — after they conducted a probation search at his house and apparently found a large hunting knife on top of the refrigerator and a BB gun near the dining-room table. The police report says that these were illegal to possess under the terms of his probation.[3] The legal analysis will depend in important part on whether Mr. Foster appeared to be suicidal while he was in jail. It will also depend on how the defendants handled Mr. Foster, given his apparent state. Some facts suggest that Mr. Foster appeared suicidal, while others suggest that he did not.

The arrest report shows that deputies arrested Mr. Foster at 7:09 p.m.[4] According to the deputies, Mr. Foster resisted his arrest; ultimately five deputies subdued him and placed him in a WRAP restraint, which controls movement and allows transport.[5] The deputies do not recall any suicidal comments before they placed him in the WRAP.[6] During the arrest, Mr. Foster sustained facial abrasions.[7] The deputies transported him to Queen of the Valley Hospital so that he could be medically screened and declared fit for incarceration at the jail.[8] On the way to the hospital, Mr. Foster "engag[ed] in a pattern of erratic behavior," screaming at the top of his lungs and then

---

[3] *See* Incident Report – ECF No. 94 at 5 (Ex. 1 to Woolworth Dep.). The deputies were performing law-enforcement functions, which is why the agency on the report is the American Canyon Police Department.

[4] *See* Arrest Report – ECF No. 94 at 9.

[5] *Id.*; Eddleman Dep. – ECF No. 94 at 16 (p. 50).

[6] Eddleman Dep. – ECF No. 94 at 16 (pp. 50–51); Woolworth Dep. – ECF No. 94 at 34–35 (pp. 18–19)

[7] Eddleman Dep. – ECF No. 94 at 16, 18 (pp. 51, 58).

[8] *Id.*

United States District Court
Northern District of California

1    falling silent.[9] He also said that his life was pointless and he wanted to die (or wished he were

2    dead), which a deputy sheriff relayed to hospital staff early in the intake process.[10] Another deputy

3    said that he "probably thought . . . [Mr. Foster] was under the influence or had some kind of

4    mental illness, but I can't tell you if that's exactly what I was thinking at the time."[11] He

5    mentioned too that Mr. Foster apologized for his behavior and said that he was bipolar.[12] The

6    hospital cleared Mr. Foster, and the deputies took him to the county jail.[13]

7        When they arrived at the jail, one of the transporting deputies noted on an intake form

8    (completed at 8:50 p.m.) that Mr. Foster had indicated that he was suicidal. More specifically, on

9    an "Agency Advisory Form," or "AAF," the deputy circled an item to reflect that he had heard Mr.

10   Foster make "suicidal comments"; below this, he handwrote that Mr. Foster had "said that he

11   wished he would die."[14] Also at 8:50 p.m., an intake deputy completed a "medical pre-screening

12   questionnaire" on Mr. Foster.[15] Among other things, this form indicated that Mr. Foster arrived in

13   the WRAP, did not appear under the influence of drugs or alcohol, had a psychiatric disorder, was

14   under a doctor's care for bipolar disorder, and was currently taking the psychiatric medications

15   Wellbutrin and Seroquel.[16] It indicated that he had attempted suicide in the past (with no more

16   specific time frame given) but that he did not presently feel suicidal.[17] The form instructed that if

17   any answers to the medical questions were "yes," then the officer should contact medical.[18]

18       Then, the defendant Mary Johnson, a registered nurse who works for California Forensic

19   Medical Group and who was working at the jail that night, did an intake "health assessment" of

20

21   [9] Id. at 17 (p. 57).

     [10] Id. at 16−18 (pp. 52−54, 58.)

22   [11] Woolworth Dep. – ECF No. 94 at 39−40 (pp. 26−27).

23   [12] Incident Report – ECF No. 94 at 6.

24   [13] Medical Records – ECF No. ECF No. 105-1 at 26-33; Eddleman Dep. – ECF No. 94 at 18 (p. 59).

     [14] Agency Advisory Form – ECF No. 105-1 at 35.

25   [15] McGlothern Dep. – ECF No. 94 at 50, 54−58 (pp. 15, 27−29); Pre-Screening Questionnaire – ECF

26   No. 105-1 at 52.

     [16] See id.

27   [17] Id.

28   [18] Id.

Mr. Foster.[19] Nurse Johnson read Mr. Foster's intake forms (the AAF and the medical pre-screening questionnaire). She signed both forms.[20] She examined and questioned Mr. Foster, taking his blood pressure and so on, in order to complete her own "nursing assessment of psychiatric and suicidal inmate" form.[21] Which she also more simply calls the "psychiatric form."[22] While doing this assessment, Nurse Johnson explained, "I'm . . . noticing whether or not he's tearful or if he has flat affect . . . ."[23] She noted on the form that he had a diagnosis of depression and bipolar disorder.[24] In addition to the Wellbutrin and Seroquel, Nurse Johnson also noted that he was taking Lamictal.[25] When she moved to the "suicidology" part of her inquiry, she noted that Mr. Foster had no past history of suicidal ideation, gesture, or attempt — because that was "what Mr. Foster told me."[26] She further noted that he had no "current suicidal ideation," because, "He told me that he was not feeling suicidal."[27] She did not check the box for "inmate is currently at risk to harm self or others" because she "forgot."[28] She referred Mr. Foster to the prison's mental-health staff (the persons tasked with performing mental-health evaluations) based on his mental-health medication and not his suicidal ideations, but she gave him only a "normal" (non-urgent) rather than an "emergency" referral.[29] There were no mental-health counselors

---

[19] Johnson Dep. – ECF No. 94 at 70, 73 (pp. 32, 59). Nurse Johnson signed both the Agency Advisory Form and the Pre-Screening Questionnaire; the latter reflects her signature at 9:00 p.m. *See* Exs. J & K – ECF No. 94 at 138, 140.

[20] *See* Exs. J & K – ECF No. 94 at 138, 140; *see* Johnson Dep. – ECF No. 94 at 73 (p. 59).

[21] Nursing Assessment – ECF No. 105-1 at 73; Johnson Dep. – ECF No. 94 at 73-74 (pp. 59–65).

[22] Johnson Dep. – ECF No. 94 at 73 (p. 61).

[23] *Id.*

[24] *Id.* at 74 (p. 62); Nursing Assessment – ECF No. 105-1 at 73.

[25] Nursing Assessment – ECF No. 105-1 at 73. All three drugs are used to treat depression or bipolar disorder or both.

[26] Johnson Dep. – ECF No. 94 at 74 (p. 64).

[27] *Id.*

[28] Johnson Dep. – ECF No. 10-1 at 68 (p. 65).

[29] *See* Johnson Dep. – ECF No. 105-1 at 65–66, 71 (pp. 55–56, 79).

working that night;[30] the next day, mental-health staff reviewed Nurse Johnson's referral and put Mr. Foster on a wait list to meet with mental-health counselors.[31]

The crux at this point in the chronology is that Nurse Johnson determined that Mr. Foster did not need to be put into a "safety cell" — that is, a special holding unit where he would not have had the means to kill himself.[32] This meant that other "officers [were] clear to put Mr. Foster in whatever housing they designate[d] he should go to."[33]

On the night that he was booked into jail, Mr. Foster also met with another defendant, Watch Commander Christina Wilson.[34] The watch commander appears to be a principal on-duty authority at the jail; and, more pertinent here, has the ultimate say on whether an inmate is placed on suicide watch.[35] Commander Wilson knew Mr. Foster from his previous incarceration and was aware "that he had an existing mental health diagnosis."[36] She spoke with Mr. Foster "almost immediately" when he arrived.[37] In assessing how he should be housed while in the jail, Commander Wilson (among other things) read a log entry from one of Mr. Foster's earlier periods of incarceration at the jail.[38] This entry, from mid-June 2012, stated: "[A]fter release, items were found in cell indicating a possible future suicide attempt. [I]f returned to custody place in holding cell until cleared by mental health."[39] Commander Wilson considered this a "cause for concern."[40] It prompted her "to further interview Mr. Foster to find out exactly what his mindset was . . . and if

---

[30] Martinez Dep. – ECF No. 105-1 at 46 (p. 58).

[31] Progress Log – ECF No. 105-1 at 138.

[32] *See* Johnson Dep. – ECF No. 105-1 at 65–66 (pp. 55–56).

[33] *Id.* at 65 (p. 55).

[34] Wilson Dep. – ECF No. 105-1 at 84–85 (pp. 51–52).

[35] *Id.* at 76 (p. 28); Martinez Dep. – ECF No. 105-1 at 44–45 (pp. 56–57).

[36] Wilson Dep. – ECF No. 105-1 at 78, 81 (pp. 43, 47).

[37] *Id.* at 96.

[38] *See id.* at 95-96. The jail maintains a "chrono log" that records information about an inmate's stay at the jail: statements made upon booking, their cell assignment, any disciplinary actions, their release date, and so forth. *See* Chrono Log – ECF No. 105-1 at 91–92.

[39] Chrono Log – ECF No. 105-1 at 91.

[40] Wilson Dep. – ECF No. 105-1 at 95-96 (pp. 42–43).

United States District Court
Northern District of California

he was at imminent risk."[41] "[T]o make [that] determination," Commander Wilson relates, she decided to speak with him at length."[42] She further testified:

> [H]e appeared upset to me. So I recall having an extended conversation with him regarding his medication. And he was upset more that I recall that he had messed up in his words. And I had a conversation with him regarding if he was feeling suicidal. And he said, no. I'm just really upset because I messed up.
>
> . . . .
>
> And he said I'm just upset, Ms. Wilson. I promise you, I'm not feeling like hurting myself. . . . I have dealt with him in the past and had conversations with him. And at that point, I felt that he was just upset about being arrested.
>
> . . . .
>
> He did not appear to be an immediate risk. I used a lot of different things to make that assessment because if I felt with his demeanor and his affect that he was still a risk, it would not matter if he told me yes or no.[43]

Commander Wilson "determined that [Mr. Foster] was not an immediate risk," and so "did not need to go into the safety cell."[44] She recounts that Mr. Foster "was really concerned that we were going to place him in the safety cell."[45] "He agreed that he would request to speak with [her] should anything change as far as his mental state."[46] She referred him for a mental-health evaluation to take place the next day.[47]

The next morning between 8:00 and 8:58 a.m., one of the jail's "classification specialists," Stuart Vosburg, reviewed Mr. Foster's file (essentially, the forms discussed in the previous section), and interviewed him, to ensure that he was housed in the correct sort of unit.[48] The jail did not "maintain" a copy of the housing-classification forms and thus did not produce them in

---

[41] *Id.* at 96 (p. 43).

[42] *Id.*

[43] *Id.* at 85–87 (pp. 52−54).

[44] *Id.* at 88–89 (pp. 55−56).

[45] *Id.*

[46] *Id.* at 89 (p. 56).

[47] *Id.*

[48] Vosburg Dep. – ECF No. 94 at 116–18 (pp. 13–15). He does not remember performing the classification but described his typical process of reviewing the intake forms, the medical prescreening, and records from prior incarcerations. Vosburg Dep. − ECF No. 105-1 at 116−120 (pp. 17−21).

United States District Court
Northern District of California

discovery; defense counsel reported that the jail discards the forms after someone is released from custody.[49] Mr. Vosburg has been trained to recognize when inmates are at risk of self-harm.[50] Mr. Vosburg determined that Mr. Foster could be placed into the "north jail" — which was not a "safety cell."[51] Mr. Vosburg has testified that, if Mr. Foster had "indicated . . . that he was presently suicidal," he would have "placed him in a safety cell" for "suicide-watch monitoring" and would have alerted other appropriate personnel.[52]

Mr. Foster was placed in a cell in the "SHU" (or secured housing unit) with two cellmates.[53] Troy Duncan is the correctional officer who supervised Mr. Foster's housing unit and served him breakfast at 6:25 a.m., lunch at 11:40 a.m., and supervised recreation time from 9:40 a.m. to 10:40 a.m.[54] Officer Duncan described Mr. Foster as looking "really down,"[55] though in his deposition, he testified that Mr. Foster "didn't appear any more down than any other inmate in jail."[56] Officer Duncan describes Mr. Foster as mentioning "several times" that "he was bi-polar," asking for his medication, and asking to use the phone because he needed his medication and was about to "lose it."[57] Mr. Foster told him that he had asked for his medication the night before at intake.[58] A nurse checked up on his cellmate, and Mr. Foster asked her about the medication; she responded that she did not have any order for it.[59] Officer Duncan let Mr. Foster and his cellmates out during recreation time, and Mr. Foster made a phone call for about 30 to 40 minutes (later determined to be to his wife).[60] He then had a shower and Officer Duncan took him back to his cell, where he

---

[49] Nold Decl. − ECF No. 104, ¶ 23.

[50] Vosburg Dep. – ECF No. 94 at 125 (p. 34).

[51] See id. at 119–24 (pp. 25–30).

[52] Vosburg Decl. – ECF No. 96 at 3 (¶¶ 14, 17).

[53] See Duncan Dep. – ECF No. 94 at 99 (p. 94).

[54] Id. at 98 (p. 93).

[55] Duncan Interview – ECF No. 105-1 at 145 (p. 3).

[56] Duncan Dep. – ECF No. 94 at 101 (p. 104).

[57] Duncan Interview – ECF No. 105-1 at 145−146 (pp. 3, 6).

[58] Id. at 146 (p. 6).

[59] Id. at 147 (p. 7).

[60] Id.; Duncan Dep. – ECF No 94 at 101 (p. 103).

United States District Court
Northern District of California

looked "really down."[61] Officer Duncan at one point heard "sobbing" and "assumed" that it was Mr. Foster but didn't go up to check, but another time looked in on his cell and he "seemed fine."[62] The accident report records reflect that Officer Duncan did a safety and security check of the unit at 1:55 p.m. (but does not specify whether that includes the cell itself though presumably it did).[63] Officer Duncan then left the unit to do other work: taking out garbage and laundry, and relieving another officer in the control room so that she could take a 15-minute break."[64] While he was still in the control room, at 2:20 p.m., Mr. Foster's cell was "ringing in."[65] According to Mr. Foster's cellmates, they were asleep, had awakened, found him hanging, and tried to summon assistance by banging on the cell door, screaming loudly (so "that if someone was sitting there, they would hear it"), and by ringing the call button many times, for at least five minutes.[66] When another staff member came back to relieve Officer Duncan, he went to the cell "real quick," and "that's when they got — started yellin' 'man down.'"[67] At the cell, he found that Mr. Foster had hanged himself with his bed sheet.[68] He called for "medical and additional officers" to respond.[69] The latter personnel administered lifesaving measures but were unsuccessful. At approximately 2:45 p.m., the medical staff pronounced Mr. Foster dead.[70]

Mr. Foster was not seen by the jail's mental-health staff before he killed himself.[71]

\* \* \*

---

[61] Duncan Interview – ECF No. 105-1 at 145 (p. 3); Duncan Dep. – ECF No 94 at 101 (p. 103).

[62] Duncan Interview – ECF No. 105-1 at 145–46 (pp. 3, 6).

[63] Accident Report − ECF No. 94 at 148 (Bates number 000007).

[64] *Id.;* Duncan Interview – ECF No. 105-1 at 147 (p. 7); Duncan Dep. – ECF No. 94 at 104–05 (pp. 117–19).

[65] Accident Report − ECF No. 94 at 148 (bates number 000007); Duncan Interview – ECF No. 105-1 at 148 (p. 8) ("the cell rang in"); Duncan Dep. – ECF No. 94 at 105–06 (pp. 119–23).

[66] Hauff Interview – ECF No. 105-1 at 133–34 (pp. 7, 10)

[67] Duncan Interview – ECF No. 105-1 at 148 (p. 8).

[68] Duncan Interview – ECF No. 105-1 at 148–49 (pp. 8−9); Duncan Dep. – ECF No. 94 at 106 (p. 124).

[69] Duncan Dep. – ECF No. 94 at 106 (p. 124).

[70] *Id.* at 107 (p. 125); Accident Report – ECF No. 94 at 148.

[71] *Id.* at 86 (p. 56).

United States District Court
Northern District of California

The plaintiff sues individual defendants Commander Wilson, Officer Duncan, and Nurse Johnson; she sues as an entity defendant the County of Napa.[72] Against the individual defendants she brings the following claims:

- Claim 1 – Violation of plaintiff's "rights to familial relationship";
- Claim 2 – "Deliberate indifference to decedent's medical needs";
- Claim 3 – Violation of right to "life and security of person";
- Claim 5 – Survival action for "violation of decedent's civil rights";
- Claim 6 – "Wrongful death – Negligence" under Cal. Code of Civ. Pro. § 377.60[73]

Against the County of Napa the plaintiff brings one claim — Claim 4 — under *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978).[74] The plaintiff seeks compensatory and punitive damages, attorney's fees and litigation costs, and any other relief that may be proper.[75]

The Napa defendants together move for summary judgment against the whole of the plaintiff's complaint, and Nurse Johnson in her own separate motion moves for summary judgment on claims 1, 2, 3, and 5 (but not claim 6).[76]

### SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

United States District Court
Northern District of California

---

[72] 2nd Am. Compl. – ECF No. 81 at 1–3.

[73] *Id.* at 9–13 (¶¶ 38–49, 59–67).

[74] *Id.* at 10–11 (¶¶ 50–58).

[75] *Id.* at 13.

[76] Napa Motion – ECF No. 93; Johnson Motion – ECF No. 97.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

The Napa individual defendants move for summary judgment on the grounds that (1) their conduct did not violate Mr. Foster's rights under the Eighth Amendment or the Fourteenth Amendment because they were not deliberately different to his needs or safety, (2) they are in any

event entitled to qualified immunity, and (3) they were not negligent.[77] Nurse Johnson similarly

contends that as a matter of law, she was not deliberately indifferent to Mr. Foster's needs.[78]

### 1. Section 1983 — Deliberate Indifference

The Ninth Circuit has "long analyzed claims that correction facility officials violated pretrial

detainees' constitutional rights by failing to address their medical needs (including suicide

prevention) under a 'deliberate indifference' standard." *Clouthier v. County of Contra Costa*, 591

F.3d 132, 1241 (9th Cir. 2010) (citing cases), *overruled in part by Castro v. County of Los Angeles*,

833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).[79]

### 1.1 Convicted Prisoner or Pretrial Detainee? — Eighth or Fourteenth Amendment?

The first issue is whether, as an arrested probation violator, Mr. Forest was a convicted inmate

or a pretrial detainee for § 1983 purposes. The applicable § 1983 test will depend on this decision.

If Mr. Foster was a convicted prisoner, then his § 1983 claim would arise under the Cruel and

Unusual Punishment Clause of the Eighth Amendment; if he was a pretrial detainee, then his

§ 1983 claim lies under the Due Process Clause of the Fourteenth Amendment. *E.g., Castro*, 833

F.3d at 1067-68 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). The difference is significant.

"Under both clauses," Mr. Foster "must show that the prison officials acted with 'deliberate

indifference.'" *Castro*, 833 F.3d at 1068. The tests for identifying "deliberate indifference" are,

however, different under these respective clauses. The Eighth Amendment test contains a

---

[77] Napa Motion – ECF No. 93.

[78] Johnson Motion – ECF No. 97.

[79] *Castro* overruled *Clouthier* "to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim." *Castro*, 833 F.3d at 1070. *Castro* did not displace the "deliberate indifference" test; to the contrary, *Castro* reaffirmed "deliberate indifference" as the basic rule in § 1983 excessive-force and failure-to-protect cases. *Id.* at 1068. As discussed below, the test manifests differently depending on whether a § 1983 claim is stated under the Eighth or Fourteenth Amendment. *Id.* at 1067-71. To the immediate point, *Castro* did not upend the "long" practice of judging custodial-suicide claims under (one or the other permutation of) "deliberate indifference." *Castro* also reads custodial-suicide suits as a species of failure-to-protect cases, which undeniably elicit the "deliberate indifference" test.

1  subjective component, whereas the Fourteenth Amendment test is "purely objective." *Id.* at 1067–

2  68, 1070–71 (discussing, *inter alia*, *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015)).

3      The plaintiff's section 1983 claims against the individual defendants are all couched under the

4  Fourteenth Amendment.[80] The plaintiff accordingly insists that for § 1983 purposes Mr. Foster was

5  a pretrial detainee.[81] After being arrested for violating probation, the plaintiff reasons, Mr. Foster

6  had a "conditional liberty interest" and would have been entitled to a hearing before his probation

7  was revoked.[82] The Napa defendants counter that Mr. Foster had already been convicted and

8  sentenced. He could not otherwise have been on probation. He thus was already subject to

9  punishment. In the Napa defendants' view, the plaintiff's § 1983 claims thus fall under, should

10  have been brought under, and now should be assessed under the Eighth Amendment.[83] "Due

11  Process is inapposite," the Napa defendants insist, and "the Eighth Amendment . . . controls."[84]

12      The court thinks that it must deem Mr. Foster a pretrial detainee. The Ninth Circuit's decision

13  in *Ressy v. King Cty.*, 520 F. App'x 554 (9th Cir. 2013), does treat the § 1983 claim of a prisoner

14  who was being held in "pre-hearing detention for a probation violation," as the grievance of a

15  "pretrial detainee[]," properly assessed under the Fourteenth Amendment. *See id.* at 554–55

16  ("[T]he Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's

17  protection against cruel and unusual punishment, applies to pretrial detainees . . . .") (quoting

18  *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010)).

19      The defendants' argument to the contrary — a sentence of probation is a sentence, the

20  probationer knows that he is subject to the government's supervision, and the Eighth Amendment

21  thus applies as a matter of law — is not convincing.[85] They cite no case — and the court is not

22  

---

23  [80] 2nd Am. Compl. – ECF No. 81 at 9–10, 12 (¶¶ 38–49, 59–67).

24  [81] ECF No. 104 at 14-15.

    [82] *Id.*

25  [83] For the Napa defendants' argument on this point, see ECF No. 93 at 2, 13-14; ECF No. 107 at 11.

26  [84] ECF No. 93 at 2, 13. Apart from the question of the controlling "deliberate indifference" test, the
    Napa defendants argue that they are entitled to summary judgment simply because the plaintiff has not
27  advanced an Eighth Amendment claim. *Id.* at 13-14. The discussion in the main text effectively rejects
    this argument.

28  [85] Napa Reply – ECF No. 10 at 11.

United States District Court
Northern District of California

aware of any — to support their conclusion. Instead, their cases establish only the legal principle that probationers have a lower expectation of privacy under the Fourth Amendment, which means that they are not subject to the ordinary warrant and probable-cause requirements of the Fourth Amendment.[86] That does not obviously result in a conclusion that the Eighth Amendment applies to a probationer-detainee's claims challenging conditions of confinement or a failure to protect from harm. The Eighth Amendment would apply to similar challenges by a probationer serving a jail sentence as a condition of probation. But that is not the case here.

Instead, here there was only an allegation that Mr. Foster violated his terms of probation. Mr. Foster was entitled to a hearing on the charge — after notice, with an opportunity to be heard, and with a statement of reasons for any revocation — under Cal. Penal Code § 1203.3. The defendants point out that a court has the power to sentence up to the maximum for the underlying offense.[87] That is true, but that does not change the outcome either. It is only after a court hearing, and only by the court, and only based on articulated reasons, that a court can revoke probation and sentence a probationer to a custodial sentence. *See id.*

The defendants also argue that Foster's probation was summarily revoked upon his arrest.[88] It was not. Only a probationer's escape from a custodial sentence (served as a condition of probation) results in automatic revocation. *Id.* § 1203.3(c).

The court thus declines to view the plaintiff's claims as arising under the Eighth Amendment; it views them instead as they are nominally framed, under § 1983 and the due-process guarantee of the Fourteenth Amendment.

### 2.2 The Basic Rule — "Deliberate Indifference" — Subjective and Objective Tests

The effect of this decision on the working analysis is, again, significant. If the plaintiff's § 1983 claim were cast under the rubric of the Eighth Amendment, she would have to prove

United States District Court
Northern District of California

---

[86] *Id.* (citing *People v. Woodall*, 216 Cal. App. 4th 1221, 1233 (2013).

[87] *Id.*

[88] *Id.*

subjective elements to show that the defendants were "deliberately indifferent" to Mr. Foster's situation. More fully, as the Ninth Circuit has explained:

> A prison official cannot be found liable under the Cruel and Unusual Punishment Clause [of the Eighth Amendment] for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "In other words, the official must demonstrate a *subjective awareness* of the risk of harm." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010), *cert. granted and judgment vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

*Castro*, 833 F.3d at 1068 (parallel citations omitted) (emphasis in *Conn*).

The "deliberate indifference" test under the Due Process Clause of the Fourteenth Amendment is, by contrast, "purely objective." *See id.* at 1069–70. "[T]he elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved — making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the "facts and circumstances of each particular case."'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473) (quoting in turn *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Thus," under this test, "a pretrial detainee who asserts a due process claim for failure to protect" must "prove more than negligence but less than subjective intent — something akin to reckless disregard." *Castro*, 833 F.3d at 1071.

On the present facts, read in the light most favorable to the non-moving plaintiff, and as discussed more extensively in the next section, the court finds that a fact question exists on every

element of this test for Commander Wilson and Nurse Johnson. In other words, and in sum, a reasonable jury could find that in these circumstances, a reasonable law-enforcement officer and Nurse Johnson "would have appreciated the high degree of risk involved" — *i.e.,* that Mr. Foster might attempt suicide — and that their "failure to take reasonable measures" beyond those that they did take "caused [Mr. Foster's] injuries." *See Castro*, 833 F.3d at 1072.

Even under an Eighth Amendment standard, there is a triable issue of fact about whether the defendants were subjectively aware. A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Thus, the plaintiff must raise a triable issue that the individual defendants knew that Mr. Foster was in substantial risk of killing himself yet deliberately ignored the risk. *See Simmons*, 609 F.3d at 1018. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted).

The risk of suicide was articulated by Mr. Foster, who threatened to kill himself, it was documented in jail records, and it was reflected in commitment records from four months early which warned jail staff to take suicide precautions. This is not an isolated exception to the jail's overall treatment of a detainee that militates against the finding of deliberate indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Instead, there is evidence to conclude that the defendants were subjectively aware of the risk of suicide but failed to house him to address that risk or otherwise ensure that he would receive medical help. Put another way, given that they implemented no procedures to address a known risk, and in the context of facts that permit a jury to conclude that Mr. Foster appeared suicidal, their explanations that they were not subjectively aware of the risk need to be heard to be credited.

In sum, there are triable issues of fact that preclude summary judgment as a matter of law as to Commander Wilson and Nurse Johnson.

United States District Court
Northern District of California

1    Officer Duncan's situation is different. The suicide happened on his watch, in the SHU,

2    apparently during the 25 minutes after his security check at 1:55 p.m. and by 2:20 p.m. Unlike the

3    other two defendants, he apparently was not aware of the reports regarding suicide risk and instead

4    knew only that Mr. Foster was very upset, had mental-health issues, needed his medication, spent

5    a long time on his phone call, and cried. He also was not responsible for the failure to order a

6    prompt mental-health assessment or for the failure to deliver the medication. The plaintiff points to

7    his failure to call mental-health providers or supervisors, but the evidence is uncontroverted that

8    Mr. Foster requested his medications at intake and that day to the nurse who came to evaluate his

9    cell mate. Moreover, Officer Duncan was not responsible for the housing classification. While

10   safety checks may be required every 15 minutes for those on suicide watch, the record does not

11   suggest that leaving for 25 minutes or failing to respond for "at least five minutes" is objectively

12   unreasonable. *See Castro*, 833 F.3d at 1071. The court thus grants the motion for summary

13   judgment in favor of Officer Duncan.[89]

14

15   **2.   Qualified Immunity — "Clearly Established Right"**

16       **2.1 The Basic Rule**

17       The Napa defendants next contend that they are qualifiedly immune from the plaintiff's

18   claims. "Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983

19   if 'their conduct does not violate clearly established statutory or constitutional rights of which a

20   reasonable person would have known.'" *Castro*, 833 F.3d at 1066 (quoting *Harlow v. Fitzgerald*,

21   457 U.S. 800, 818 (1982)). "To determine whether an officer is entitled to qualified immunity, a

22   court must evaluate two independent questions: (1) whether the officer's conduct violated a

23   constitutional right, and (2) whether that right was clearly established at the time of the incident."

24   *Id.*, 833 F.3d at 1066–67 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). It is not

25

26   _____

27   [89] For the reasons articulated by the County defendants, the court concludes that the plaintiff is
     mistaken when she describes how Officer Duncan covered the cell window. *See* Opposition − ECF No.
     104 at 11, 20; Napa Reply − ECF No. 107 at 7. Officer Duncan's interview does not support the

28   conclusion that the plaintiff draws.

1    "mandatory" to address these two prongs in this order. *Pearson*, 555 U.S. at 232–36. Courts are to

2    "exercise their sound discretion in deciding which prong . . . should be addressed first in light of

3    the particular circumstances of the case at hand." *Id.* at 236.

4

5    ## 2.2  "Clearly Established Rights" in Cases of Custodial Suicide

6    The court starts with the second question. Did Mr. Foster have a "clearly established right" to

7    — for now, speaking broadly — some additional actions by the Napa defendants that might have

8    prevented his suicide?

9    "To be clearly established, a right must be sufficiently clear that *every* reasonable official

10   would have understood that *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d

11   1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (*per curiam*)

12   (emphasis in *Hamby*). "Although a plaintiff need not find 'a case directly on point, . . . existing

13   precedent must have placed the . . . constitutional question beyond debate.'" *Hamby*, 821 F.3d at

14   1091 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). "That is, existing precedent must

15   have 'placed beyond debate the unconstitutionality of' the officials' actions, as those actions

16   unfolded in the specific context of the case at hand." *Hamby,* 833 F.3d at 1091 (quoting *Taylor,* 135

17   S. Ct. at 2044). "Hence, a plaintiff must prove that 'precedent on the books' at the time the

18   officials acted 'would have made clear to [them] that [their actions] violated the Constitution.'"

19   *Hamby,* 821 F.3d at 1091 (quoting *Taylor,* 135 S. Ct. at 2045). Again, the putative right must have

20   been clearly established "at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct.

21   2088, 2093 (2012).

22   This inquiry is context-specific. It cannot be conducted only at high levels of abstraction.

23   Thus, "[i]t is insufficient that the broad principle underlying a right is well-established." *Mitchell*

24   *v. Washington*, 818 F.3d 436, 447 (9th Cir. 2016) (quoting *Walker v. Gomez,* 370 F.3d 969, 978

25   (9th Cir. 2004)). Instead, "[a]s the Supreme Court again stressed recently, '[t]he dispositive

26   question is "whether the violative nature of [the defendants'] *particular* conduct is clearly

27   established."'" *Hamby*, 821 F.3d at 1091 (quoting *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015)

28   (per curiam) (quoting in turn *Al-Kidd*, 563 U.S. at 742)) (emphasis in *Mullenix*). "This inquiry

United States District Court
Northern District of California

1    'must be undertaken in light of the *specific context* of the case, not as a broad general

2    proposition.'" *Mullenix,* 136 S. Ct. at 308 (quoting *Brousseau v. Haugen*, 543 U.S. 194, 198 2004)

3    (per curiam) (emphasis added). "In recent years, the Supreme Court has repeatedly stated that the

4    'clearly established' inquiry demands that courts train their attention on the particular facts under

5    review." *Hamby*, 821 F.3d at 1091 n. 3 (citing cases).

6        "In a nutshell, according to the Supreme Court, state officials are entitled to qualified

7    immunity so long as 'none of our precedents "squarely governs" the facts here,' meaning that 'we

8    cannot say that only someone "plainly incompetent" or who "knowingly violate[s] the law" would

9    have . . . acted as [the officials] did.'" *Id.* at 1091 (quoting *Mullenix*, 136 S. Ct. at 310) (quoting in

10   turn *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

12       **2.3 Case-Specific Analysis**

13          **2.3.1   *Taylor***

14       In 2015's *Taylor v. Barkes*, *supra,* the Supreme Court discussed qualified immunity, and

15   "clearly established rights," in the context of a custodial suicide. The Court held that, in the

16   relevant time frame (November 2004), there was no clearly established right to suicide-prevention

17   protocols. *Taylor*, 136 S. Ct. at 2044.

18       The plaintiffs' decedent in *Taylor* had hanged himself while in jail. *Id.* at 2043. Like Mr.

19   Foster, the *Taylor* decedent had been arrested for violating probation. *Id.* Upon arriving at jail, he

20   was given a "mental[-]health screening designed in part to assess whether . . . [he] was suicidal."

21   *Id.* Again like Mr. Foster, the *Taylor* inmate reported past suicide attempts, and a "history of

22   psychiatric treatment," but denied being presently suicidal. *Id.* He was admitted to jail without

23   "any special suicide[-]prevention measures." *Id.* He hanged himself the next day. *Id.*

24       His wife and children sued under § 1983. They claimed that the defendant authorities — the

25   Commissioner of the state Department of Correction and the institution's warden — had violated

26   his civil rights by "failing to prevent his suicide." *Id.* It was undisputed that neither had personally

27   interacted with the decedent or knew of his condition before his death. *Id.* The theory of liability

28   was that they failed to supervise the medical contractor that provided the medical treatment —

United States District Court
Northern District of California

including the intake screening — at the institution. *Id.* Ultimately, the Supreme Court held that the district court should have granted the defendants summary judgment on the grounds of qualified immunity. *See id.* at 2043–45.

The *Taylor* Court focused specifically on whether the plaintiff had had a "clearly established right," on the relevant dates, "to the proper implementation of adequate suicide prevention protocols." *Id.* at 2044–45. The Court held that no such right existed. Reviewing federal appellate precedent — as it existed before the inmate's death — the Court held: "This purported right . . . was not clearly established in November 2004 in a way that placed beyond debate the unconstitutionality of the [jail]'s procedures . . . ." *Id.* at 2044. Furthermore, and now looking back more broadly from the perspective of June 2015 (when *Taylor* was decided), the *Taylor* Court wrote: "No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols." *Id.* The district court should have granted the defendants summary judgment because they enjoyed qualified immunity. *See id.*

### 2.3.2   *Van Orden*

In the month immediately following *Taylor*, the Ninth Circuit too addressed "clearly established rights" in the case of a custodial suicide. *Van Orden v. Downs*, 609 F. App'x 474 (9th Cir. 2015). In *Van Orden*, the Ninth Circuit effectively held that the defendants were not immune from a § 1983 suit. *Id.* at 474–75. More specifically, the appellate court held that, as of 2005, inmates had a clearly established constitutional right to be protected from "deliberate indifference" when they presented a "serious risk of suicide." *Id.* at 475. The inmate in *Van Orden* "had attempted suicide in the past" and "had been recently released from a hospital." *Van Orden v. Caribou Cnty.*, 546 F. App'x 647, 648 (9th Cir. 2013). She had also "exhibited highly unstable behavior during her incarceration." *Id.* The summary-judgment evidence "support[ed] the inference" that, while in jail, she had made "at least one suicide threat." *Id.* When the question of the defendants' immunity reached the Ninth Circuit, that court held:

1

2

3

4

5

> It was "clearly established," at least as early as 2005, "that the Eighth Amendment protects against deliberate indifference to a detainee's serious risk of suicide." *Conn v. City of Reno,* 591 F.3d 1081, 1102 (9th Cir. 2010), *judgment vacated,* 131 S. Ct. 1812, *and opinion reinstated,* 658 F.3d 897 (9th Cir. 2011); *see Farmer v. Brennan,* 511 U.S. 825, 834 (1994). [The defendants] did not need a more detailed standard to be aware that their indifference violated [the prisoner]'s constitutional rights, and ***no subsequent case has undermined the deliberate indifference standard in the context of custodial suicide***.

6

7

8

*Van Orden*, 609 F. App'x at 475 (parallel citations omitted) (emphasis added). The Ninth Circuit thus affirmed the district court's refusal to grant the defendants a qualified-immunity summary judgment. *Id.* at 474–75.

9

10

11

12

13

14

15

16

Combining all this — the general rules on qualified immunity, the Supreme Court's decision in *Taylor*, and the Ninth Circuit's in *Van Orden* — the pivotal question in this case might be phrased thus: On the "particular facts" of this case, in this "specific context," did Mr. Foster pose a "serious risk of suicide" so that any "reasonable," "competent" officer would have known that they could not be "deliberately indifferent" to his plight, and that by failing to do more than they did to protect him from suicide — because what is in question is "the violative nature of [the defendants'] particular conduct," *Hamby*, 821 F.3d at 1091 — they were clearly violating his constitutional rights?

17

18

19

20

21

22

23

24

25

26

Viewing the evidence most favorably to the plaintiff, the court thinks that a jury question exists on this point. A reasonable juror could conclude that Mr. Foster presented a "serious risk of suicide," which would have triggered the "clearly established right" that the Ninth Circuit recognized in *Van Orden.* On the one hand, when asked directly, Mr. Foster repeatedly denied being suicidal.[90] On the other, one of Mr. Foster's intake forms related that, after being arrested, he told the transporting officers that "he wished he would die."[91] Prison officials also knew that he had a history of psychiatric illness, for which he was then on medication, and that he had

27

28

---

[90] Johnson Dep. – ECF No. 94 at 70, 74 (pp. 32, 64); Pre-Screening Questionnaire – ECF No. 105-1 at 52.

[91] Advisory Form – ECF No. 105-1 at 35.

United States District Court
Northern District of California

1  previously attempted suicide.[92] The court cannot summarily hold Commander Wilson immune on

2  these facts. The question must be put to the fact-finder.

3      The court thus declines to grant summary judgment to Commander Wilson on the ground that

4  she is qualifiedly immune from suit.

5      The court recognizes that this holding reflects a tension in the law. On the one hand, in *Taylor*

6  the Supreme Court has said that, at the time of Mr. Foster's death in November 2012, through to

7  June 1, 2015 (when *Taylor* was released), nothing in its precedent established a clear constitutional

8  right to suicide-screening or -prevention protocols. *Taylor*, 135 S. Ct. at 2044−45. On the other

9  hand, in a decision that followed *Taylor* by about a month, the Ninth Circuit held that, since "at

10 least" 2005, there has been a clearly established constitutional right that protects inmates from

11 deliberate indifference when they present a serious risk of suicide. *Van Orden*, 609 F. App'x at

12 475. This would suggest that if inmates exhibit a serious suicide risk, then they have a

13 constitutional right guaranteeing that corrections officers attend to their needs. As precedent

14 stands, reading both *Taylor* and *Van Orden*, this court holds that a reasonable jury could find that

15 Mr. Foster presented a "serious risk of suicide" that triggered his "clearly established right" to

16 something more than "deliberate indifference."

17     As to Officer Duncan, qualified immunity is another ground that supports the court's grant of

18 summary judgment to him.

19

20 **3. Wrongful Death – Cal. Code Civ. Pro. § 377.60**

21     The County defendants argue that because Mr. Foster exhibited no immediate need and denied

22 suicidal ideation, they are entitled to summary judgment on the plaintiff's negligence claim.[93]

23     Section 377.60 of the California Code of Civil Procedure establishes the wrongful-death cause

24 of action. That statute provides: "A cause of action for the death of a person caused by the

25 wrongful act or neglect of another may be asserted by any of the following persons or by the

26

27 ―――――――――――――――
   [92] Pre-Screening Questionnaire – ECF No. 105-1 at 52; Johnson Dep. – ECF No. 94 at 74 (pp. 62-64).

28 [93] County Motion − ECF No. 93 at 23.

1   decedent's personal representative on their behalf . . . ." Cal. Code Civ. Pro. § 377.60; *see, e.g.,*

2   *Garcia v. Adams*, 2006 WL 403838, *4 (E.D. Cal. Feb. 17, 2006).

3       Because a jury question exists on whether Commander Wilson acted wrongfully, by depriving

4   Mr. Foster of his constitutional rights, and thereby caused his death, the court denies her motion

5   for summary judgment on the California wrongful-death claim.

6       The issue of Officer Duncan's responsibility is closer with negligence than it was with the

7   constitutional claims. But given that medical and housing staff were responsible for assessing and

8   addressing Mr. Foster's needs, Officer Duncan's responsibility turns on the 25 minutes he was

9   absent and "at least five minutes" between ringing and response because he could not leave his

10  temporary post until someone relieved him. The court does not think there are triable issues of fact

11  about his responsibility and thus grants him summary judgment on the negligence claim.

12

13  **4.  *Monell* Liability**

14      The plaintiff's sole claim against the County of Napa is for liability under *Monell v. Dep't of*

15  *Soc. Svcs.*, 436 U.S. 658 (1978).[94]

16      Liability against a government entity starts from the premise that there is no *respondeat*

17  *superior* liability under § 1983; *i.e.*, no entity is liable simply because it employs a person who has

18  violated a plaintiff's rights. *See, e.g., Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045

19  (9th Cir. 1989). Local governments can be sued directly under Section 1983 only if the public

20  entity maintains a policy or custom that results in a violation of plaintiff's constitutional rights.

21  *Monell*, 436 U.S. at 690-91. To impose entity liability under § 1983 for a violation of

22  constitutional rights, a plaintiff must show: (1) the plaintiff possessed a constitutional right of

23  which he or she was deprived; (2) the municipality had a policy; (3) this policy amounts to

24  deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force

25  behind the constitutional violation. *See Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d

26  432, 438 (9th Cir. 1997).

27

28  _____

[94] 2nd Am. Compl. – ECF No. 81 at 10-11 (¶¶ 50-58).

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

The Ninth Circuit has explained:

> There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cnty. of San Francisco,* 308 F.3d 968, 984-85 (9th Cir. 2002)). The practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988) *overruled on other grounds by Bull v. City and Cnty. of San Francisco,* 595 F.3d 964 (9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

The plaintiff first claims that the County's intake and classification policy has gaps that allow a watch commander to make housing determinations that are contrary to the County's suicide detection and prevention policy.[95] But she points to no deficiencies in the policy.[96] As the County observes, it is undisputed that the policy meets or exceeds California's regulatory framework, and that the jail undergoes a comprehensive audit every two years by the Board of State and Community Corrections.[97] The plaintiff thus does not "show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012). She also does not identify deficiencies in the policies that are "closely related to the ultimate injury." *City of Canton v. Harris*, 489 U.S. 378, 391–92 (1989)).

---

[95] Opposition – ECF No. 105 at 22.

[96] *See id.* at 12.

[97] Wilson Decl. – ECF No. 95, ¶¶ 14-12.

1    The plaintiff also points to a practice of letting unqualified, untrained correctional officers to

2    make housing assessments for detainees with mental-health issues.[98]

3    "In limited circumstances, a local government's decision not to train certain employees about

4    their legal duty to avoid violating citizens' rights may rise to the level of an official government

5    policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's

6    culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to

7    train." *Id.* (citing *Tuttle*, 471 U.S. at 822–23 (plurality opinion) ("[A] 'policy' of 'inadequate

8    training' " is "far more nebulous, and a good deal further removed from the constitutional

9    violation, than was the policy in *Monell* ")). "To satisfy the statute, a municipality's failure to train

10   its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons

11   with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*,

12   489 U.S. 378, 388 (1989)). Only then "can such a shortcoming be properly thought of as a city

13   'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 389; *see Connick*,

14   563 U.S. at 61–62.

15   "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal

16   actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan

17   Cty. v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or

18   constructive notice that a particular omission in their training program causes city employees to

19   violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the

20   policymakers choose to retain that program." *Connick*, 563 U.S. at 61 (citing *Bryan Cty.*, 520 U.S.

21   at 407). "The city's 'policy of inaction' in light of notice that its program will cause constitutional

22   violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'"

23   *Id.* at 61–62 (quoting *City of Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and

24   dissenting in part)). "A less stringent standard of fault for a failure-to-train claim 'would result in

25   *de facto respondeat superior* liability on municipalities . . . .'" *Id.* at 61 (quoting *City of Canton*,

26   489 U.S. at 392); *see Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (opinion of Brennan, J.)

27

28   _____
     [98] Opposition – ECF No. 105 at 12, 22.

United States District Court
Northern District of California

1   ("[M]unicipal liability under § 1983 attaches where — and only where — a deliberate choice to

2   follow a course of action is made from among various alternatives by [the relevant] officials . . .

3   ."). Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily

4   necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563

5   U.S. at 62 (quoting *Bryan Cty.*, 520 U.S. at 409). "Policymakers' 'continued adherence to an

6   approach that they know or should know has failed to prevent tortious conduct by employees may

7   establish the conscious disregard for the consequences of their action — the 'deliberate

8   indifference' — necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cty.*, 520 U.S. at 407

9   (internal quotation marks omitted)). "Without notice that a course of training is deficient in a

10  particular respect, decisionmakers can hardly be said to have deliberately chosen a training

11  program that will cause violations of constitutional rights." *Id.*

12      Commander Wilson testified that she was not trained to prepare any forms when she assesses

13  suicide risk and housing decisions.[99] But she also describes her training on identifying risk of

14  suicide and preventing it.[100] Mr. Vosburg — the classification officer — testified that policies did

15  not dictate what he must review in making housing decisions.[101] But he also testified that it was

16  his practice to review the intake forms, the medical prescreening, and records from prior

17  incarcerations; he identified his processes for classification, and he described his training on

18  identifying suicide risk.[102] At its essence, the plaintiff's argument is only that more or better

19  training could have been provided. That is not a basis for *Monell* liability. *Ting v. United States*,

20  927 F.2d 1504, 1512 (9th Cir. 1991).

21      Finally, the plaintiff argues that the County ratified the correctional staff's wrongdoing by

22  failing to take corrective action and thereby condoning the conduct.[103]

23

24

---

25  [99] Wilson Dep. − ECF No. 10-1 at 82 (p. 48).

26  [100] Wilson Decl. − ECF No. 95, ¶¶ 10, 12.

    [101] Vosburg Dep. – ECF No. 105-1 at 124−25 (pp. 30−31).

27  [102] *Id.* at 116−120 (pp. 17−21); Vosburg Decl.− ECF No. 96, ¶¶ 7, 9, 12−17).

28  [103] Opposition − ECF No. 104 at 23−24 (citing 2nd Am. Compl. ¶¶ 11, 52, and 56).

Finding that an officer acted within policy does not alone amount to *Monell* ratification. *Dunklin v. Mallinger*, 2013 U.S. Dist. LEXIS 51871, 92–95 (N.D. Cal. Apr. 10, 2013); *Garcia v. City of Imperial*, 2010 WL 3911457, *1–3 (S.D. Cal. Oct. 4, 2010) (discussing cases); *see Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189–91 (D. Haw. 2003). "In other words, in order for there to be [*Monell*] ratification, there must be 'something more' than a single failure to discipline or the fact that the policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia*, 2010 WL 3911457 at *2 (citing *Kanae*, 294 F. Supp. 2d at 1191).

This "something more" may be an "obviously flawed investigation." *See Garcia*, 2010 WL 3911457 at *2 (discussing *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)). It may exist where the final decision-maker "actively participated" in the challenged conduct. *See Lytle v. Carl*, 382 F.3d 978, 986–88 (9th Cir. 2004). "Extreme factual situations" can also support ratification liability. *See Garcia*, 2010 WL 3911457 at *2 (discussing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)). But generally, to hold a government entity "liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983," thereby creating an "end run around *Monell*." *Gillette v. Delmore*, 979 F.3d 1342, 1348 (9th Cir. 1992).

"Here, there are no extreme facts or special circumstances that support a finding of ratification." *Garcia*, 2010 WL 3911457 at *3. The plaintiff premises her *Monell* ratification argument entirely on the existence of the allegedly deficient policy and the County's failure to do something more. This is legally insufficient. *See id.* at *1–3.

The court grants summary judgment in favor of the County on the *Monell* claim.

## 5.  Punitive Damages

The County individual defendants also move for summary judgment on the plaintiff's prayer for punitive damages.

A § 1983 plaintiff may recover punitive damages against an official capacity if the official acted with malicious or evil intent or in callous disregard of a plaintiff's federally protected rights.

*Smith v. Wade*, 461 U.S. 30, 56 (1983). A plaintiff must show such conduct by a preponderance of the evidence. *See Dang v. Cross,* 422 F.3d 800, 807–08 (9th Cir. 2005); *see also Smith v. City of Oakland,* 538 F. Supp.2d 1217, 1246 (N.D. Cal. 2008). "Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." Model Civ. Jury Inst. 9th Cir. 5.5; *see Dang,* 422 F.3d at 807.

To obtain punitive damages under California law, a plaintiff must show by clear and convincing evidence that a defendant acted with malice, fraud, or oppression.  Cal. Civ. Code § 3294; *Roby v. McKesson Corp.,* 47 Cal. 4th 686, 712 (2009).

There is a triable issue of fact about reckless disregard that precludes summary judgment for Commander Wilson on the viability of punitive damages for the constitutional claims. But there is no triable issue of fact that would allow a reasonable jury to conclude that she acted with malice, fraud, or oppression.

## 6. Evidentiary Objections

The court denies the Napa defendants' objections to the authenticity of the Hauff interview, primarily because it is the defendants' public record. *See* Fed. R. Evid. 803(8). The chrono log similarly is a public record or a business record. The court has a fundamental problem with the defendants' objecting to the relevance of their own records that were undisputedly considered in the housing classification at issue here. The court denies the other objections as moot because the evidence was not necessary for the court's decision. To the extent that the defendants challenge the plaintiff's characterization of evidence, the court considers the evidence itself. The parties' characterizations are argument.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### CONCLUSION

The court grants summary judgment in favor of Troy Duncan, grants summary judgment to the County on the *Monell* claim, grants summary judgment on the prayer for punitive damages for the state wrongful-death claim, and otherwise denies the summary-judgment motions. As to the constitutional torts, the issues are close, but there is a genuine issue of material fact about whether Mr. Foster appeared suicidal and this in turn affects the qualified-immunity analysis. Moreover, while the court ruled in the County's favor on the *Monell* analysis, the system did not work at at least three defined points in the intake process. Viewing the evidence in the light most favorable to the plaintiff, jury questions exist, and the defendants' account of the risk that they perceived needs to be heard to be credited.

This disposes of ECF Nos. 93 and 97.

**IT IS SO ORDERED.**

Dated: December 15, 2016

_____
LAUREL BEELER
United States Magistrate Judge